FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 16, 2025

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAVID KRZESNI, an individual, | No. 2:24-CV-00040-MKD |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| WELLPINIT SCHOOL DISTRICT, a legally separate body corporate or political; and JOHN ADKINS, an individual, | **ECF No. 34** |
| Defendants. | |

On April 21, 2025, the Court held a hearing on Defendants' Motion for Summary Judgment, ECF No. 34. ECF No. 59. Rachel Stanley represented Defendants Wellpinit School District ("WSD") and Superintendent John Adkins, and Michael Love and Matthew Crotty represented Plaintiff David Krzesni. *See id.* For the reasons stated below, the Court grants Defendants' Motion for Summary Judgment.

ORDER - 1

## UNDISPUTED FACTUAL BACKGROUND

### A. Defendant WSD and the Grant

Defendant WSD is located within the boundaries of the Spokane Reservation, and most of its students are members of the Spokane Tribe of Indians. ECF No. 36 at 2 ¶ 3.  On September 20, 2022, the United States Department of Education ("DOE") awarded WSD the Native Youth Community Project ("NYCP") Grant (the "Grant").  *Id*.  The Grant helps fund educational programs for Native American students within tribal communities.  *Id*.   WSD had received the Grant on multiple prior occasions.  *Id*.

WSD contracted with Mr. Krzesni to serve as the Grant's Project Director, effective January 10, 2023.  *Id.* at 3 ¶ 6; ECF No. 41-1 at 3-4.  As Project Director, Mr. Krzesni's responsibilities included overseeing the Grant funding and meeting the Grant's objectives.  ECF No. 41-1 at 4.  Mr. Krzesni understood that as "the director of the project," he "needed to be aware of how funds were being utilized and to do [his] best to ensure that [WSD was] in compliance with the rules and policies of the [G]rant."  *Id.* at 5.  Rainy Anderson, WSD's Business Manager; Defendant John Adkins, WSD's Superintendent; Kim Ewing, the elementary school principal; and Laina Walker, another WSD principal, supervised Mr. Krzesni.  ECF No. 55 at 3 ¶ 4, 4 ¶ 13, 7 ¶ 29, 10 ¶ 54.

WSD's contact at DOE for the Grant was Donna Bussell in the Office of

ORDER - 2

Indian Education ("OIE").  *Id.* at 2-3 ¶ 4.  Ms. Bussell was only able to discuss the

Grant with the certifying officials on record for the Grant, who were Mr. Krzesni

and Ms. Ewing.  ECF No. 36 at 8 ¶ 24; ECF No. 41-1 at 6-7.  Between January 10

and May 9, 2023, Mr. Krzesni was the sole contact between WSD and DOE

regarding the Grant.  ECF No. 36 at 8 ¶ 24.

## B. The Hawaii Trip

Prior to Mr. Krzesni beginning his contract, WSD had planned for several

students and staff to participate in a peer mediation program in Hawaii.  *Id.* at 3 ¶

7.

In January 2023, at the start of his employment, and before he knew that

DOE would not allow Grant funds to be used for the Hawaii trip, Mr. Krzesni

signed a requisition form for these funds to be used for the trip.  ECF No. 47 at 1-2

¶ 2.  Ms. Walker also signed a requisition form for Grant funds to be used for the

Hawaii trip.  ECF No. 51-1 at 4.  The Grant funds were held by the Stevens County

Treasurer.  *Id.* at 3.  Ms. Anderson and Wendy Stensgar, another WSD employee,

were authorized to tell the Stevens County Treasurer to withdraw funds from the

Grant.  ECF No. 55 at 11 ¶ 61.  Mr. Krzesni did not have such authority.  *Id.*

On February 27, 2023, Mr. Krzesni submitted revisions to the Grant budget

to Ms. Bussell for review.  ECF No. 41-7 at 2.  Ms. Bussell responded, "Just

quickly reviewing the budget and I see travel to Hawaii.  This was not in the

ORDER - 3

original grant application therefore it will not be approved." *Id.*   Mr. Krzesni

replied:

> Can we discuss the Hawaii trip more?  We see it as an important activity toward meeting the Social and Emotional Learning goals of the grant which relate to Objectives 6 and 7.  Students and staff will both be trained in a peer mediation program as well as an Indigenous Hawaiian process of reconciliation and forgiveness called Ho'oponopono.  Upon our return, we will implement a district-wide peer mediation program that is expected to reduce major disciplinary referrals.

*Id*.  Ms. Bussell wrote back:

> . . . I will discuss the Hawaii trip with my supervisors and get back with you tomorrow.  It sounds amazing and I would love to say yes but I would have to ask them first because our guidelines on travel [are] pretty strict.

*Id*.

> On March 2, 2023, Mr. Krzesni emailed Ms. Anderson:

> [Ms. Bussell] from OIE initially denied my request to reallocate funds for Hawaii.  I had a discussion with her about how we see it is an important activity toward meeting the grant objective.  At heart, she supports the idea, but I think it's the cost of travel.  She said she'll bring it to her supervisors.

> So that's where we are.  I think we'll likely be able to get approval, but it'll likely be after the trip's already done.  So, we definitely need to be careful about when we next draw down funds and what's included.

ECF No. 41-8 at 2.

Mr. Krzesni attended the Hawaii trip from March 6 to March 14, 2023.  ECF

No. 55 at 4 ¶ 14.  While in Hawaii, Mr. Krzesni emailed Ms. Anderson asking to

have a check in when he returned.  ECF No. 41-9 at 2.  On March 13, 2023, Mr.

ORDER - 4

Krzesni again emailed Ms. Anderson from Hawaii, this time regarding his authority to approve his staff's absence requests.  ECF No. 40-1 at 4.

Ms. Anderson confirmed such requests were within his discretion, and he replied:

> Thanks.  I'm very glad you see it that way.  We're not at that stage with anyone else and I'm not convinced we're going to get there.  Nevertheless, I'll do everything I can to support my team and insulate them from my own frustrations.  I'll just be open in saying that I'm hoping to prepare one of the new staff to step into the director role as soon as they're ready.
>
> I'm also going to hire the current consultant Megan to provide some leadership and organizational change support.  She's too expensive, but I'm not sure anyone else is in a very good position to do it.

*Id.* at 3-4.  Ms. Anderson asked, "If [you're] wanting to prepare them to step into the director role does that mean you're preparing to leave?"  *Id.* at 3.  Mr. Krzesni replied:

> That's what I was getting at.  I meant to save the conversation for later, but it's been eating at me.  I'd like to leave the possibility of improvement open, while also working on an exit strategy that I could feel OK about.  I have in mind to give it 6 months.
>
> The two new hires are both Spokane and are going to be in the community in some capacity forever.  I care a lot about having a positive impact, but I also have to feel like I'm achieving something.  The best path I can see is to try to build them up to the point that I'm not needed.

*Id.*

Ms. Anderson forwarded this email chain to Ms. Walker and Ms. Ewing.  *Id.* at 2.

ORDER - 5

**C. After the Hawaii Trip**

In March 2023, after these emails, Ms. Anderson and Mr. Adkins began to have discussions about not renewing Mr. Krzesni's contract.  ECF No. 41-5 at 13.

On April 3, 2023, Ms. Anderson drew down Grant funds to pay for the Hawaii trip.  ECF No. 40 at 3 ¶ 4.

On April 11, 2023, Mr. Krzesni emailed Ms. Anderson about the upcoming Annual Performance Report ("APR").  ECF No. 41-10 at 2.  Mr. Krzesni inquired about what, besides salaries, was encumbered but not yet drawn down, noting, "It's also tricky with the Hawaii trip unresolved."  *Id*.  He further stated, "The other lingering thing is that the updated budget was never entirely approved.  At some point [Ms. Bussell] had said it looked OK except for Hawaii, but it seemed implicit that wasn't a formal approval."  *Id*.

Sometime in April 2023, Ms. Anderson informed Mr. Krzesni that she had already drawn down the funds to pay for the Hawaii trip.  ECF No. 41-5 at 14.  Ms. Anderson does not recall Mr. Krzesni stating verbally or in writing that Grant funds "definitive[ly]" could be used for the Hawaii trip.  ECF No. 51-1 at 6-7.

Mr. Krzesni prepared the APR for certification by Ms. Ewing, which contained the following description of the Hawaii trip:

> **Travel $55011.05**
> Travel expenses have included travel for peer mediation training in Hawaii, the project director's attendance of the Washington State Indian Education Association Conference, and the previous project

director's attendance of the NYCP Project Director's Conference.

Hawaii Travel: 17 youth and 5 staff were trained in a Native Hawaiian approach to peer conflict mediation-- to our knowledge, the only Indigenous peer-mediation training in the United States. Staff guided reflection and debrief on adapting and implementing the model in the school. Staff were prepared to support students. The peer mediation approach will be implemented at the elementary, middle and high school levels. The opportunity was utilized to visit the University of Hawaii. Additionally, the travel provided a unique opportunity for cultural exchange and traditional Hawaiian restorative justice training. The resulting peer mediation program within the district will benefit Objective 6 to reduce major disciplinary incidents and through improving student engagement will also address Objective 7 to improve student attendance and Objective 3 to improve academic performance.

The travel for Washington Indian Education Association Conference provided a valuable opportunity for networking and collaboration with state agencies and educational leaders, and provided useful information for the NYCP team on new opportunities to reach the project's objectives. Most notably, the project director learned from the state Office of Native Education, about unique opportunities to provide credit for student's cultural experience, knowledge, and Salish language fluency through a mastery-based credit approach.

ECF No. 47-1 at 7. On April 25, 2023, Ms. Ewing signed and certified the APR.

*Id.* at 3. Mr. Krzesni then submitted it. ECF No. 55 at 5 ¶ 18.

Mr. Krzesni was Jamie Lovato's supervisor. ECF No. 47 at 3 ¶ 8.

Mr. Krzesni was present on April 23, 2023, when Ms. Lovato informed Terry Bartolino, a WSD school Principal and WSD's Title IX Coordinator, that a student had reported being sexually abused by another student. ECF No. 38 at 2 ¶¶ 2-3; ECF No. 48 at 2 ¶¶ 3-4. Ms. Bartolino informed Mr. Adkins about the report the same day. ECF No. 38 at 2 ¶ 4. Ms. Bartolino also asked Ms. Lovato to provide a

ORDER - 7

formal statement, which Ms. Lovato sent to Ms. Bartolino on April 24, 2023. *Id*. at 2 ¶ 3.

On May 1, 2023, Celia Stearns, Mr. Adkins's assistant, emailed a copy of Mr. Krzesni's contract to WSD's general counsel Jon Dalley. ECF No. 41-11 at 2-5; ECF No. 55 at 5 ¶ 19. The following day, Mr. Adkins called Mr. Dalley to discuss not renewing Mr. Krzesni's contract. ECF No. 41-3 at 5-8.

On May 3, 2023, Mr. Krzesni emailed Ms. Bussell to ask if they could have a "check-in" meeting, and he inquired whether Jennifer LeBret, the NYCP Director for the Spokane Tribe, could join as well. ECF No. 41-13 at 2-3.

The same day, Mr. Krzesni also emailed Mr. Adkins's assistant and asked to add discussion of another project, the Pit House,[1] to the next school board meeting agenda. ECF No. 41-12 at 2. Mr. Adkins responded:

> This Pit House Restoration effort is amazing, important and long overdue. However please remember, as I mentioned previously, that Laina will be our Wellpinit School District admin lead for this project. Therefore, I need you and her to team with Kim and Rainy to clearly outline the progressive steps involved. I want to be assured this is done properly, thoughtfully, and respectfully in relation to the valued culture and history involved. I also want to be assured that this restoration will be stable and sustainable into the future. When the team involved feels this criteria is in place I'll put this item on the Board agenda. However, it will not be on the 5/8/2023 Board meeting agenda. Finally, and maybe the most important thought is we need the Spokane Tribe of

---

[1] The Pit House is a structure on WSD property with spiritual and cultural significance for Spokane tribal members. *See* ECF No. 41-2 at 5-6.

ORDER - 8

Indian Council's blessing on the plans involved.

*Id.*  On May 4, 2023, Mr. Adkins, through Ms. Stearns, forwarded Mr. Dalley this email chain.  ECF No. 41-14 at 2-3.

On May 5, 2023, Mr. Dalley spoke with Mr. Adkins about Mr. Krzesni. ECF No. 41-3 at 3.  According to Mr. Dalley, they discussed the Pit House email chain, as an example of Mr. Adkins's concern that Mr. Krzesni was not working well with the other Grant administrators.  *Id.* at 3.

On May 8, 2023, at 5:17 a.m., Mr. Dalley sent Mr. Adkins a list of "Talking Points" for his conversation with Mr. Krzesni about not renewing his contract. ECF No. 41-15 at 2.  The same morning, Mr. Adkins, Ms. Anderson, Ms. Ewing, and Ms. Walker met and decided not to renew Mr. Krzesni's and Ms. Lovato's contracts.  ECF No. 36 at 6 ¶¶ 16-17.

Separately, on May 8, 2023, Mr. Krzesni, Ms. Bussell, and Ms. LeBret had a Teams call, during which Ms. Bussell said that drawing down the Grant funds without DOE approval constituted "fraud."  ECF No. 46-7 at 46-47, 69.

On May 9, 2023, Mr. Adkins called Mr. Dalley.  ECF No. 41-3 at 7.  This conversation stood out to Mr. Dalley because he was on vacation at the time.  ECF No. 46-6 at 15.  Mr. Dalley testified during his deposition that Mr. Adkins called to let him know Mr. Krzesni had been told his contract would not be renewed and that WSD would be reaching out to Ms. Bussell to "let her know that things would

ORDER - 9

be changing." *Id.* at 18.  When asked if Mr. Adkins's conversation with

Mr. Krzesni occurred on May 9, 2023, Mr. Dalley testified that his understanding

was that this conversation had occurred the day before, May 8, 2023.  *Id.* at 19-20.

Mr. Adkins also testified during his deposition that he informed Mr. Krzesni and

Ms. Lovato that their contacts would not be renewed on May 8, 2023.  ECF

No. 41-2 at 12, 15-16.  Mr. Krzesni disputes that Mr. Adkins informed him and

Ms. Lovato that their contracts would not be renewed on May 8, 2023.  ECF No.

55 at 6 ¶ 25, 7 ¶ 26.  In declarations submitted in February 2025, Mr. Krzesni and

Ms. Lovato state that Mr. Adkins informed them that their contracts would not be

renewed on May 16, 2023, not May 8, 2023.  ECF No. 47 at 3 ¶ 5; ECF No. 48 at

2-3 ¶ 7.

On May 9, 2023, Ms. Anderson emailed Ms. Bussell to tell her that

Mr. Adkins would like to speak with her "regarding a matter that has to do with

[the Grant] as soon as possible."  ECF No. 41-16 at 3.  According to

Ms. Anderson, the urgency of that email was to let DOE know that "[w]e had

decided to non[-]renew [Mr. Krzesni], and we had let him know.  And we needed

to let [Ms. Bussell] know that we were not going to be renewing [Mr. Krzesni's]

contract as of [October 1, 2023], and what we needed to do to change everything

over when he was no longer there."  ECF No. 41-5 at 6.

On May 10, 2023, Ms. Bussell forwarded Ms. Anderson's May 9, 2023,

ORDER - 10

email to Mr. Krzesni and Ms. Ewing, adding:

> . . . I received this message earlier.  I am only able to speak with the project director and certifying official on record.  There were some discrepancies found on the APR therefore the grant is on route payment until further notice.  An official letter will be sent soon.  Thank you.

ECF No. 41-17 at 2-3.  That same day, Mr. Krzesni sent Ms. LeBret a screenshot of Ms. Bussell's email and stated, "Can't help but assume the superintendent is trying to get DOE to remove me."  ECF No. 41-18 at 2.

On May 11, 2023, Ms. Ewing forwarded Ms. Bussell's email to Ms. Anderson, who replied to Ms. Ewing: "I didn't receive this.  I'm not sure what the discrepancies are that she's talking about."  ECF No. 41-17 at 2.  The same day, Ms. Ewing emailed Ms. Bussell requesting to speak with her "about a confidential matter," copying Mr. Adkins and Ms. Anderson but omitting Mr. Krzesni.  ECF No. 36 at 7 ¶ 21; ECF No. 52-4 at 2.  Ms. Bussell responded solely to Ms. Ewing to propose a meeting date and time, and Ms. Ewing forwarded this to Ms. Anderson and Mr. Adkins.  *Id.*

On May 15, 2023, Mr. Krzesni noted the following in an email chain with Noe Medina, a contract Grant Evaluator for WSD,[2] and Ms. Anderson:

> There have been some updates that might be more pressing than next year's budget.  [Ms. Bussell] has notified me that we are now on route payments and that she will be requiring itemized explanations for all expenditures before we will be able to request to draw down.  She has

---

[2] ECF No. 39 at 2 ¶ 2.

ORDER - 11

also told me that she will be requiring the district to repay the costs associated with the Hawaii trip.

ECF No. 41-19 at 2.  Ms. Anderson asked Mr. Krzesni to send her "what [Ms. Bussell] sent regarding this."  *Id.*

On May 16, 2023, Ms. Ewing, Mr. Adkins, and Ms. Anderson had a call with Ms. Bussell to inform her of the change in Project Director.  ECF No. 36 at 7 ¶ 21, 8 ¶ 23; ECF No. 52-4 at 2.

On June 6, 2023, Ms. Anderson sent DOE a reimbursement check for the Hawaii trip in the amount of $51,827.68.  ECF No. 40 at 5 ¶ 11; ECF No. 55 at 17 ¶ 106.

## PROCEDURAL HISTORY

On February 8, 2024, Mr. Krzesni filed a Complaint against WSD and Mr. Adkins, bringing claims for: (1) violation of whistleblower retaliation protections under the National Defense Authorization Act ("NDAA"), 41 U.S.C. § 4712, and (2) wrongful discharge in violation of public policy, specifically in retaliation for reporting employer misconduct.  ECF No. 1 at 10-11 ¶¶ 29-40.

On October 17, 2024, Mr. Krzesni filed a Motion to Amend Complaint. ECF No. 17.  He sought to add an additional claim of wrongful discharge in violation of the public policy reflected in RCW 26.44.030(1)(a),[3] based on his

---

[3] RCW 26.44.030(1)(a) requires certain individuals, including "professional school

involvement in Ms. Lovato's reporting of allegations that a student had been sexually abused by another student. *Id.* at 5, 21-22. On November 22, 2024, the Court granted him leave to amend, ECF No. 25, and he filed an Amended Complaint, ECF No. 26. On December 6, 2024, Defendants filed their Answer. ECF No. 28.

On January 31, 2025, Defendants moved for summary judgment on all of Mr. Krzesni's claims, ECF No. 34, Mr. Krzesni responded, ECF No. 44, and Defendants replied, ECF No. 49.

## LEGAL STANDARD

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes*

---

personnel," to report incidents where they have "reasonable cause to believe that a child has suffered abuse or neglect."

ORDER - 13

*Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record and the evidence that "demonstrate the absence of a genuine dispute of material fact." *Celotex*, 477 U.S. at 323 (quoting former Fed. R. Civ. P. 56(c)) (quotation marks omitted). After the moving party has satisfied its burden, the non-moving party must demonstrate, through evidence on the record, "specific facts" showing that there is a genuine dispute of material fact for trial. *Id.* at 324 (citation and quotation marks omitted).

The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

1

**DISCUSSION**

2  Defendants seek summary judgment contending that (1) Mr. Krzesni is not a

3  whistleblower under the NDAA, and (2) that WSD did not wrongfully discharge

4  Mr. Krzesni.  ECF No. 34 at 8, 13.

5  **A. NDAA Protected Disclosures**

6  The NDAA protects an employee of a contractor who discloses information

7  the employee "reasonably believes is evidence of" one of the following types of

8  misconduct: (1) "gross mismanagement of a [f]ederal contract or grant," (2) "a

9  gross waste of [f]ederal funds," (3) "an abuse of authority relating to a [f]ederal

10  contract or grant," (4) "a substantial and specific danger to public health or safety,"

11  or (5) "a violation of law, rule, or regulation related to a [f]ederal contract . . . or

12  grant."  41 U.S.C. § 4712(a)(1).  An employee may make a protected disclosure of

13  such misconduct to "[a] [f]ederal employee responsible for contract or grant

14  oversight or management at the relevant agency."  *Id.* § 4712(a)(2)(D).

15  The NDAA defines the term "abuse of authority" as "an arbitrary and

16  capricious exercise of authority that is inconsistent with the mission of the

17  executive agency concerned or the successful performance of a contract or grant of

18  such agency."  *Id.* § 4712(g)(1).

19  "An employee makes a protected disclosure 'if a disinterested observer with

20  knowledge of the essential facts known to and readily ascertainable by the

employee [could] reasonably conclude that the actions [at issue] evidence gross mismanagement, a gross waste of funds, an abuse of authority, or a violation of any law, rule, or regulation.'" *Busselman v. Batelle Mem'l Inst.,* No. 18-CV-5109, 2019 WL 7763845 at *5 (E.D. Wash. Nov. 15, 2019) (quoting *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 890 (9th Cir. 2004)) (alterations from *Busselman*).[4]  "To show that [he] held the requisite reasonable belief, [a plaintiff] 'need not prove that the condition disclosed actually established one or more of the listed categories of wrongdoing,' but instead 'must show that the matter disclosed was one which a reasonable person in h[is] position *would believe* evidence one of the situations specified.'"  *Id.* at *5 (*quoting Drake v. Agency for Int'l Dev.*, 543 F.3d 1377, 1382 (Fed. Cir. 2008)) (emphasis in *Busselman*).

The NDAA includes a burden-shifting requirement under which, "[t]he legal burdens of proof specified in section 1221(e) of title 5 shall be controlling for the purposes of any . . . judicial . . . proceeding to determine whether discrimination prohibited under this section has occurred."  41 U.S.C. § 4712(c)(6).  Under this

---

[4] Due to "scant interpretive case law" regarding the NDAA, the court in *Busselman* drew from cases regarding the "parallel provisions" of the Whistleblower Protection Act of 1989, 5 U.S.C. § 2302, and the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1553, 123 Stat 115, 297.  *Id.* at *5.

framework, an employee must first "demonstrate[] that a disclosure . . . was a contributing factor in the personnel action" taken against them.  5 U.S.C. § 1221(e)(1).  An employee may make this showing "through circumstantial evidence," including evidence that "the official taking the personnel action knew of the disclosure" or "the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure . . . was a contributing factor in the personnel action."  *Id*. § 1221(e)(1)(A), (B).  If such a showing is made by the employee, the employer must then "demonstrate[] by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure."  *Id*. § 1221(e)(2).

Defendants assert that Mr. Krzesni's whistleblower/NDAA claim fails as a matter of law, first because he did not make a protected disclosure under the NDAA, and second because there is no genuine dispute of fact that, even if he had made a protected disclosure, such disclosure was not a contributing factor to the non-renewal of his contract with WSD.  ECF No. 34 at 10-13.

*1.  Whether Mr. Krzesni Made a Protected Disclosure under the NDAA*

Defendants assert that Mr. Krzesni did not make a protected disclosure under the NDAA when (1) submitting the APR to the DOE, or (2) during the May 8, 2023, Teams call with Ms. Bussell.  *Id.* at 10.

ORDER - 17

1          i.    Submission of the APR to the DOE

2          Defendants argue that Mr. Krzesni's "report" to the DOE on April 27, 2023,

3    was simply "the electronic submission of the completed APR that was certified by

4    Ms. Ewing." *Id.*

5          Mr. Krzesni listed the Hawaii trip's travel expenses in Section B of the APR

6    under "Budget Information."  ECF No. 47-1 at 7.  There, Mr. Krzesni described the

7    Hawaii trip in detail, explaining that "17 youth and 5 staff were trained in a Native

8    Hawaiian approach to peer conflict mediation," which, to Mr. Krzesni's

9    knowledge, was "the only Indigenous peer-mediation training in the United

10   States." *Id.*  Mr. Krzesni went on to conclude that "the travel provided a unique

11   opportunity for cultural exchange and traditional Hawaiian restorative justice

12   training[,]" and that "[t]he resulting peer mediation program within [WSD] will

13   benefit Objective 6 to reduce major disciplinary incidents and through improving

14   student engagement will also address Objective 7 to improve student attendance

15   and Objective 3 to improve academic performance." *Id.*

16         This section of the APR does not in any manner disclose misconduct, but

17   rather details the Hawaii trip and how it met Grant objectives.

18         Mr. Krzesni argues that it was his "choice to report the [Grant] misuse in the

19   APR" and he intended to "elevat[e] that issue to DOE" while also "trying to spin

20   the [issue] in his employer's favor."  ECF No. 44 at 7 (citing ECF No. 45 at 32 ¶

ORDER - 18

149; ECF No. 46-7 at 43-44); *see also* ECF No. 47 at 4 ¶ 9.  However, as discussed above, the APR did not include any mention of a misuse of funds.  Further, the submission of the APR was a requirement of the Grant – activities funded by the Grant had to be reported.   *See* ECF No. 36 at 5 ¶ 15 (Ms. Ewing: "At no point did anyone at WSD attempt to conceal the fact that the Hawaii trip was included in the APR or that Grant funds had gone towards the expenses associated with the trip."); ECF No. 52 at 2 ¶ 3 (Ms. Anderson: "The Hawaii trip was included as a Grant-funded activity because WSD used Grant funding and believed it to be properly included."); ECF No. 46-7 at 44 (Mr. Krzesni: "At the point the funds were drawn down especially, there was no hiding it.  We had to include it in the report."); ECF No. 47 at 10 ¶ 11(n) (Mr. Krzesni: "At the point I wrote the APR, I learned the funds had been drawn down and felt I had to include it in the report whether or not it was approved, simply because I wasn't willing to lie.").

The Court concludes that no disinterested observer with knowledge of the facts could reasonably conclude that, by justifying the Hawaii trip in the required APR, Mr. Krzesni raised concerns of gross mismanagement, a gross waste of funds, or an abuse of authority by WSD.  *See Busselman*, 2019 WL 7763845, at *5.  Thus, the Court finds that Mr. Krzesni did not make a protected disclosure about the Hawaii trip in the APR.

1           ii.    Teams Call with Ms. Bussell

2           Defendants argue that Mr. Krzesni did not make a protected disclosure

3  during the May 8, 2023, Teams call with Ms. Bussell.  ECF No. 34 at 10.

4           As Project Director, Mr. Krzesni was responsible for ensuring compliance

5  with Grant regulations.  ECF No. 41-1 at 5.  Before the Hawaii trip, Mr. Krzesni

6  expressed to Ms. Anderson that WSD would "likely be able to get approval, but

7  it'll likely be after the trip's already done.  So we definitely need to be careful

8  about when we next draw down funds and what's included."  ECF No. 41-8 at 2.

9  Mr. Krzesni thought "it was very clear that [WSD] wouldn't draw down the funds

10  unless or until we had, like, a clear approval from [Ms. Bussell], which we never

11  received."  ECF No. 41-1 at 13.  However, when preparing the APR, Mr. Krzesni

12  learned from Ms. Anderson that the funds for the Hawaii trip had already been

13  drawn down.  ECF No. 46-7 at 44.

14          According to Mr. Krzesni, it was this "misuse of funds" that he reported to

15  Ms. Bussell during their Teams call.  ECF No. 41-1 at 19-20; *see also* ECF No. 46-

16  7 at 14 (Mr. Krzesni: "I did reach out to [Ms. Bussell] as I started to have concerns

17  about the district's spending, in particular the Hawaii trip."); ECF No. 47 at 4 ¶ 9

18  (Mr. Krzesni: "I already feared retaliation when I wrote the APR.  . . . I felt it was

19  safer to discuss the issues with Ms. Bussell on Teams.").  Mr. Krzesni testified

20  during his deposition that both he and Ms. Bussell felt "there were potentially

ORDER - 20

some major concerns," ECF No. 46-7 at 80, and that Ms. Bussell told him it was "fraud" for WSD to draw down the funds without approval, ECF No. 41-1 at 12. *See also* ECF No. 52-6 at 4 (Mr. Krzesni: "[Ms. Bussell] stated that she had told me we could not use the funds for the Hawaii trip and that the district would have to return the funds.  I believe her concern was not only that we had used the funds improperly, but that she felt that we drew down the funds in defiance of her instruction.").

Defendants point to Mr. Krzesni's deposition, where he testified that he "would have been hesitant to call [WSD's actions] fraud," ECF No. 41-1 at 20, and that he "just wanted to be forthcoming and honest and was going into that meeting with the attitude of, like, I think this might be a problem, and how we [would] be able to fix it," *id.* at 14.  Whether Mr. Krzesni would have called WSD's actions "fraud" is not determinative.  The issue is whether a disinterested observer with knowledge of the essential facts could reasonably conclude that Mr. Krzesni raised concerns of gross mismanagement, a gross waste of funds, or an abuse of authority.  *See Busselman*, 2019 WL 7763845, at *5.

Given the factual disputes as to what was discussed in the call, the Court cannot conclude as a matter of law that no disclosure was made.  Mr. Krzesni stated he raised such concerns by discussing with Ms. Bussell—a federal employee overseeing the Grant—WSD's spending practices and the fact that WSD drew

1    down the funds for the Hawaii trip before it obtained DOE's approval.

2        In sum, viewing the evidence in the light most favorable to Mr. Krzesni, the

3    Court finds there are sufficient factual disputes from which a jury could conclude

4    that Mr. Krzesni made a protected disclosure during the May 8, 2023, Teams call

5    with Ms. Bussell.

6        *2. Contributing Factor*

7        Defendants argue that summary judgment on the NDAA claim is proper

8    because even if Mr. Krzesni could prove that he made a protected disclosure, he is

9    not able to show that this was a contributing factor to WSD's non-renewal of his

10   contract.  ECF No. 34 at 12.  Specifically, Defendants contend the evidence in the

11   record establishes that WSD decided to non-renew Mr. Krzesni's contract before

12   Mr. Krzesni's Teams call with Ms. Bussell on May 8, 2023, and before WSD

13   became aware that Mr. Krzesni had contacted anyone in DOE regarding the

14   Hawaii trip.  *Id*.

15       The evidence in the record shows there was a period of discussion regarding

16   non-renewal of Mr. Krzesni's contract from May 1 to May 8, 2023.  On May 1,

17   2023, Mr. Adkins, through his assistant, sent Mr. Dalley an email with

18   Mr. Krzesni's contract.  ECF No. 41-11 at 2-5.  Mr. Dalley testified that he and

19   Mr. Adkins spoke on May 2 and May 5, 2023, about the decision not to renew

20   Mr. Krzesni's contract, based on Mr. Krzesni not working well with the WSD

1    team.  *See* ECF No. 41-3 at 3-8; *see also* ECF No. 41-14 at 2-3 (May 4, 2023,

2    email from Mr. Adkins, through his assistant, to Mr. Dalley).  On the morning of

3    May 8, 2023, Mr. Dalley sent Mr. Adkins a list of "Talking Points" for his

4    conversation with Mr. Krzesni about not renewing his contract.  ECF No. 41-15 at

5    2.  That same morning, Mr. Adkins, Ms. Anderson, Ms. Ewing, and Ms. Walker,

6    met and decided not to renew Mr. Krzesni's contract.  ECF No. 36 at 6 ¶16; *see*

7    *also* ECF No. 37 at 4 ¶ 11 (Ms. Walker: "As Mr. Krzesni had already indicated that

8    he was considering leaving his position at WSD after only a few months here, and

9    because we had an increasingly difficult time working with him, we decided that

10   we did not want to offer him a new contract once his contract expired at the end of

11   September 2023.").  Thus, WSD has produced evidence that it had decided not to

12   renew Mr. Krzesni's contract by May 8, 2023.[5]  Mr. Krzesni has not identified any

13

14   [5] There is a dispute of fact as to when Mr. Adkins informed Mr. Krzesni that his

15   contract would not be renewed.  *See* ECF No. 55 at 6 ¶ 25.  However, the relevant

16   issue is when Defendants decided not to renew Mr. Krzesni's contract.  *See, e.g.*,

17   *Davis v. Merit Sys. Prot. Bd.*, 278 F. App'x 1009, 1012 (Fed. Cir. 2008) (finding

18   under the Whistleblower Protection Act of 1989, 5 U.S.C. § 2302, that a personnel

19   action occurred on the date the supervisor selected someone other than the

20   petitioner for the promotion at issue).

ORDER - 23

1    evidence contravening or creating a dispute as to the timing of this decision.[6]

2         Rather, Mr. Krzesni challenges Defendants' evidence based on the "false[]

3    claims" and "dishonesty" of WSD employees and Mr. Dalley.  ECF No. 44 at 8,

4    15-16.  A court may not make credibility determinations in deciding a motion for

5    summary judgment.  *See Anderson*, 477 U.S. at 255.  "These determinations are

6    within the province of the factfinder at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

7    *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  "[I]f direct evidence

8    produced by the moving party conflicts with direct evidence produced by the

9    nonmoving party, the judge must assume the truth of the evidence set forth by the

10   nonmoving party with respect to that fact."  *Id.*  But Mr. Krzesni has not produced

11   direct evidence that conflicts with the direct evidence produced by Defendants.

12   Instead, he asks the Court to make credibility determinations, which the Court

13   cannot do.

14        Further, there is no evidence in the record that WSD was aware Mr. Krzesni

15   had engaged in protected activity when it made the non-renewal decision.

16   Notably, Mr. Dalley emailed Mr. Adkins talking points for the conversation with

17   Mr. Krzesni at 5:17 a.m., on May 8, 2023, ECF No. 41-15 at 2, and the meeting

---

18

19   [6] In responding to this argument, Mr. Krzesni instead focuses on the date he was

20   informed that his contract would not be renewed.  *See* ECF No. 44 at 9.

ORDER - 24

1    between Mr. Adkins, Ms. Anderson, Ms. Ewing, and Ms. Walker also occurred

2    that morning, ECF No. 36 at 6 ¶ 16.  Thus, there is no genuine dispute that WSD

3    decided not to renew Mr. Krzesni's contract before or around the same time as Mr.

4    Krzesni's call with Ms. Bussell, around 11 a.m. or 12 p.m. that day.  *See* ECF

5    No. 41-13 at 2.  Additionally, Ms. Bussell did not email Mr. Krzesni and

6    Ms. Ewing about the "discrepancies" with the APR until May 10, 2023—two days

7    after WSD had decided to not to renew Mr. Krzesni's contract.  ECF No. 41-17 at

8    2.  After Mr. Krzesni forwarded Ms. Bussell's email to Ms. LeBret, suggesting

9    "the superintendent was trying to get DOE to remove [him]," he acknowledged in

10   later emails that day that when Ms. Anderson and Mr. Adkins had contacted Ms.

11   Bussell, it "would have been before they knew we were in trouble with the grant

12   unless they're spying on me."  ECF No. 41-18 at 3.  Ms. Anderson did not learn

13   that the DOE would require repayment until May 15, 2023.  ECF No. 41-19 at 2;

14   ECF No. 40 at 4-5 ¶¶ 9-10.

15        Nonetheless, Mr. Krzesni points to the deposition testimony of Mr. Adkins

16   and Ms. Anderson to support the inference that WSD was aware he had engaged in

17   protected activity before deciding not to renew his contract.  ECF No. 44 at 15.

18   During his deposition, Mr. Adkins testified that he learned "there was some

19   concerns" with using Grant funds for the Hawaii trip within "a few days" of the

20   trip and that he first found out that Mr. Krzesni had reported a misuse of funds to

the DOE "shortly after the Hawaii trip." ECF No. 46-5 at 33-34, 36-37. He

subsequently testified:

> [MR. ADKINS:] . . . And I think we're confusing -- in my mind, and I
> want to clarify this, we are confusing what [Mr. Krzesni] did versus
> what maybe the federal government did in this Hawaii trip situation and
> possibly misuse of funds.
>
> You are asking me about when did we know from [Mr. Krzesni].
> Okay? The trip was fine. He said the grant would pay for it. He got
> on the plane.
>
> And then when he came back, what I heard from our team very
> clearly was, [n]ow he has concerns about that money that was spent on
> the Hawaii trip.
>
> And so when I'm answering your questions, that is in my world
> with [Mr. Krzesni] as our grant director. Okay? That was not the
> message from Washington, D.C. and the federal government. Not [Ms.
> Bussell].
>
> I did not hear that it something was inappropriately used until
> May of that year. And I think that's in the paper trail that both parties
> have. I just want to be really clear on that. I was talking about [Mr.
> Krzesni] and he changed his story. Okay? When [Ms. Bussell] did or
> didn't know, I have no idea. But I know [Ms. Bussell], in the month of
> May, wanted to make sure that the book was right, the pot was right.

*Id.* at 37-38.

When asked when she had "first [found] out that Mr. Krzesni had reported

the fund issue about the Hawaii trip to [DOE]," Ms. Anderson answered "[w]hen

we did our APR." ECF No. 46-3 at 15. Ms. Anderson subsequently stated:

> [MS. ANDERSON:] So I just wanted to clarify one question. You
> asked when I was aware of the misuse of funds. I wasn't aware of the
> any misuse of funds on our APR. I was aware of us using the funds for

ORDER - 26

the Hawaii trip.

*Id.* at 16.  Ms. Anderson also stated that whether the DOE might have an issue with WSD using the Grant money for the Hawaii trip "ha[d] been an ongoing discussion since February with [Mr. Krzesni]," and "that [Ms. Bussell] was talking to her higher ups trying to get approval, and he was hopeful that it would be approved." *Id.* at 15-16.

Based on Mr. Adkins's and Ms. Anderson's deposition testimony, they knew Mr. Krzesni had concerns about the Hawaii trip not being approved before WSD made the decision not to renew his contract.  However, this does not establish that Mr. Krzesni's potential protected disclosure—the May 8, 2023, Teams call with Ms. Bussell—was a contributing factor in WSD's decision not to renew his contract.  Nor could it have been, when there is no genuine dispute that WSD made the decision not to renew Mr. Krzesni's contract before or around the same time as that call occurred.  *See Merit Sys. Prot. Bd.*, 278 F. App'x at 1012 ("[N]o reasonable person could conclude that a disclosure was a contributing factor in a personnel action that has already occurred.") (citation omitted).

In sum, Mr. Krzesni fails to identify any evidence in the record that establishes a genuine dispute of material fact about whether his May 8, 2023, call with Ms. Bussell was a contributing factor in WSD not renewing his contract.

Thus, the Court grants summary judgment to Defendants on the NDAA claim.[7]

**B. Washington Common Law Wrongful Discharge Claim**

Per the Washington Supreme Court, "[t]he tort for wrongful discharge in violation of public policy has generally been limited to four scenarios:"

> (1) where employees are fired for refusing to commit an illegal act;
> (2) where employees are fired for performing a public duty or obligation, such as serving jury duty;
> (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and
> (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing.

*Martin v. Gonzaga Univ.*, 425 P.3d 837, 843 (Wash. 2018) (quoting *Gardner v. Loomis Armored, Inc.*, 913 P.2d 377, 379 (Wash. 1996)) (quotation marks omitted) (paragraph breaks added).

For a wrongful discharge claim that falls under one of these categories to be successful, a plaintiff must first show that the "discharge may have been motivated by reasons that contravene a clear mandate of public policy." *Id.* at 844 (quoting *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984)). "'The question of what constitutes a clear mandate of public policy is one of law' and can

---

[7] Because Mr. Krzesni has not established a genuine issue of material fact regarding a prima facie element of his NDAA claim, the Court does not reach his arguments regarding pretext. *See* ECF No. 44 at 17-20.

ORDER - 28

be established by prior judicial decisions or constitutional, statutory, or regulatory provisions or schemes." *Id.* (quoting *Dicomes v. State*, 782 P.2d 1002, 1006 (Wash. 1989)).  A plaintiff's "mere opinion" about what constitutes a clear mandate of public policy will not suffice.  *Id.*

After meeting that initial step, a plaintiff must "show that the public-policy-linked conduct was a 'significant factor' in the decision to discharge the worker . . . and may do so by circumstantial evidence." *Id.* (quoting *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 821 P.2d 18, 29, 32 (Wash. 1991)).  If the plaintiff successfully presents a prima facie case, "the burden then shifts to the employer to 'articulate a legitimate nonpretextual[,] nonretaliatory reason for the discharge.'" *Id.* (quoting *Wilmot*, 821 P.2d at 29).  This burden is one of production, not persuasion.  In other words, "[t]he employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion, because the employer does not have that burden[.]" *Wilmot*, 821 P.2d at 29 (citation omitted).  If the employer succeeds in articulating such a reason, the burden shifts back to the plaintiff to demonstrate either that the reasons proffered are in fact pretextual, or that even if the employer's justification is legitimate, "the public-policy-linked conduct was nevertheless a substantial factor motivating the employer to discharge the worker." *Martin* 425 P.3d at 844 (quoting *Wilmot*, 821 P.2d at 31) (alteration omitted).

Defendants argue that Mr. Krzesni's claim fails as a matter of law because he was not discharged but fully completed his contract with WSD.  ECF No. 34 at 14 (citing RCW 28A.405.210(2)(a)).[8]

The Washington Supreme Court has established that "the tort of wrongful discharge in violation of public policy clearly applies *only in a situation where an employee has been discharged*."  *Roberts v. Dudley*, 993 P.2d 901, 911 (Wash. 2000), *as amended* (Feb. 22, 2000) (emphasis added).  Washington courts have distinguished between a discharge and a contract nonrenewal for a certificated employee of a school district.  *See Davis v. Tacoma Sch. Dist.*, No. 46334-2-II, 2015 WL 4093904, at *3 (Wash. Ct. App. 2015).  "Discharge operates on an employee's current contract."  *Id.*  "In contrast, a nonrenewal operates prospectively by giving notice, before a specific date, that the employee's contract will not be renewed for the next contract term."  *Id.* (citing *Barnes v. Seattle Sch. Dist. No. 1*, 563 P.2d 199, 200 (Wash. 1977)).

Here, WSD did not renew Mr. Krzesni's contract.  *See, e.g.*, ECF No. 41-15.

---

[8] RCW 28A.405.210(2)(a) states, in relevant part, that a school board "shall make with each employee employed by it a written contract, which shall be in conformity with the laws of this state, and except as otherwise provided by law and under (b) of this subsection, limited to a term of not more than one year."

This nonrenewal is not a discharge for the purpose of the tort of wrongful discharge in violation of public policy.  *See McMinimee v. Yakima Sch. Dist. No. 7*, No. 18-CV-3073, 2021 WL 298199, at *2 (E.D. Wash. Jan. 5, 2021) ("Under present Washington law, an employee is not discharged where she continues to receive a salary and benefits on a one-year contract that is subsequently not renewed.").  As Mr. Krzesni cannot establish a prima facie element of his claims for wrongful discharge in violation of public policy, the Court grants summary judgment to Defendants on those claims.[9]

## CONCLUSION

For the reasons stated herein and on the record, Defendants' Motion for Summary Judgment on all claims is granted.

Accordingly, **IT IS HEREBY ORDERED:**

1.    Defendants' Motion for Summary Judgment, **ECF No. 34**, is **GRANTED**.

---

[9] Accordingly, the Court does not reach Defendants' other arguments for summary judgment.  *See* ECF No. 34 at 13-15.

ORDER - 31

1    **IT IS SO ORDERED.** The District Court Executive is directed to (1) enter

2   this Order; (2) provide copies to the parties; **(3) enter judgment for Defendants**

3   **on all claims, and (4) CLOSE the file.**

4       DATED May 16, 2025.

5                   *s/Mary K. Dimke*
                    MARY K. DIMKE
6            UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20